UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-20676-CR-CMA

UNITED STATES OF AMERICA,
Plaintiff,

v.

RICHARD DANIEL,
Defendant.
_______________________________________/

**MOTION TO REDUCE SENTENCE**
**PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)**

Last year, in his Amended Motion to Reduce Sentence, Richard Daniel—who has now served 262 months of a 720-month prison sentence—explained why his "extraordinarily long sentence" under an old, excessively punitive version of 18 U.S.C. § 924(c) warranted a sentence reduction under Section 404 of the First Step Act. (D.E. 349.) While that avenue of relief is currently foreclosed by Eleventh Circuit precedent, recent changes to § 1B1.13 of the U.S. Sentencing Guidelines now allow the Court to address the gross disparity between the sentence Mr. Daniel is currently serving and the sentence that would be imposed today. That sentencing disparity, combined with Mr. Daniel's individualized circumstances, including his age at the time of the offenses and his efforts at rehabilitation, justifies a reduction of his sentence from 720 months to credit time-served or, in the alternative, 240 months.

## I. Mr. Daniel has exhausted his administrative remedies.

In accordance with § 3582(c)(1)(A), Mr. Daniel has fully exhausted his administrative remedies. That subsection allows a defendant to move for a sentence reduction in court after he has "fully exhausted all administrative remedies to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request

by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Exhaustion thus can be accomplished either by an appeal *or* by the lapse of 30 days from receipt by the warden of a reduction-in-sentence application.

Here, Mr. Daniel, through counsel, requested on November 6, 2023, that the Warden at USP Coleman file a motion on his behalf to reduce his sentence. (*See* Ex. A.) More than 30 days have lapsed since receipt by the Warden and he has not replied. Mr. Daniel has therefore met the requirements of § 3582(c)(1)(A) and the Court has jurisdiction over this motion.

## II. Mr. Daniel qualifies for a sentence reduction under U.S.S.G. § 1B1.13(b)(5).

Even setting aside the incredibly long and unjust sentence that Mr. Daniel received, the facts of this case warrant the type of judicial second look that § 3582 was expressly enacted to allow. Under § 1B1.13(b)(5), the Commission includes a catchall, entitled "Other Reasons," which states that an individual's circumstances may warrant a reduction in sentence if he "presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." Indeed, the prior iteration of this catchall was used by courts around the country to grant sentence reductions in hundreds of cases for a variety of reasons—including the non-retroactive changes to § 924(c)—before the Sentencing Commission amended the guidelines.

Mr. Daniel's constellation of unique circumstances—including, but not limited to, his young age at the time he committed the underlying offenses, his struggles with drug and alcohol addiction that he has worked to overcome while in prison, his lack of any prior felony convictions, the substantial time he has already served, as well as the overly harsh mandatory sentence he received that he would not receive today—collectively rise to the level of warranting relief.

In fact, the government recently agreed to recommend a sentence reduction in a case before Judge Middlebrooks pursuant to § 1B1.13(b)(5). *See United States v. Gomeo Rodriguez,* Case No. 97-CR-00162 (S.D. Fla. Jan. 19, 2024) at D.E. 264. Like Mr. Daniel, Mr. Rodriguez had no meaningful criminal history. Mr. Rodriguez committed a series of robberies, and received mandatory, consecutive, enhanced sentences under § 924(c) that he would not have received today. Like Mr. Daniel, Mr. Rodriguez was very young when he committed the relevant offenses and had worked hard on his own personal growth and rehabilitation while incarcerated. After initially opposing relief, the government joined in a recommendation of a reduction to credit time served.

Judge Middlebrooks accepted the joint recommendation, writing "[i]t is clear to me that Mr. Rodriguez presents extraordinary and compelling reasons for relief pursuant to the Sentencing Reform Act" and granted relief, but added that, in his view, Mr. Rodriguez qualified under U.S.S.G § 1B1.13(b)(6) as well. In his order, Judge Middlebrooks referenced the now-amended stacking provision of § 924(c), Mr. Rodriguez's growth and maturation while in prison, his record of rehabilitation and education record, and his age at the time he committed the offenses. All of these reasons apply with similar force to Mr. Daniel's case.

### ***A. Mr. Daniel was 20 years old when he committed the offenses.***

As the Court knows, studies of young adults, ages 18-21, suggest that they suffer from similar cognitive and developmental immaturities as juveniles. Mr. Daniel was 20 years old when he committed his crimes.

A 2016 study tested whether young adults aged 18-21 would behave more like adolescents or more like adults in "emotionally laden contexts."[1] The results showed that, relative to adults over 21, young adults showed diminished cognitive capacity, more like adolescents, under both brief and prolonged negative emotional arousal. Put more plainly, the brains of young adults—particularly the prefrontal cortex[2]—remain immature and prone to impulsive, emotionally triggered actions. A study funded by the Department of Justice concluded the same. Researchers opined that, "unlike logical-reasoning abilities, which appear to be more or less fully developed by age 15[,] psychological capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood[.]"[3] The study found that "adolescents and young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment or control impulses," and concluded that policymakers should implement a "categorical rule of youthfulness as a mitigating factor in sentencing" as opposed to "individualized discretion."[4]

---

[1] Alexandra O. Cohen, et al., *When Does a Juvenile Become an Adult*, 88 Temple L. Rev. 769 (2016). The Cohen study was also published as a scientific article in the journal Psychological Science under the title, *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*. 27 Psych. Sci. 549 (2016).

[2] The prefrontal cortex "plays a crucial role in advanced thinking abilities, including planning ahead and weighing risk and reward, and in self-regulation, including impulse control and the coordination of emotion and cognition." *See* Elizabeth S. Scott, et al., *Young Adulthood as a Transitional Legal Category*, 85 Fordham L. Rev. 641, 651 (2016).

[3] James C. Howell et al., Bulletin 5: Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know, 17 (July 2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf.

[4] *Id*. at 18, 29.

An immature prefrontal cortex also leads to poor risk-reward calculations and an inability to identify the full panoply of risks associated with certain behaviors.[5] This inability to fully appreciate the medium- and long-term consequences of criminal actions should be considered a mitigating condition in late adolescents and young adults.

The malleability of an individual's character must also be considered. Character changes over time; it may improve, remain stable, or even worsen. But it is the very unpredictability of how someone's character will evolve from adolescence to adulthood that makes lengthy sentences like the one Mr. Daniel received seem arbitrary.[6]

These developments in our understanding of the brains of juveniles and young adults has led to a proposed amendment by the United States Sentencing Commission for the next cycle that reflects the principles articulated in recent case law and scientific studies. Specifically, the Commission proposed that a downward departure may be "warranted due to the defendant's youthfulness at the time of the offense," and that to determine whether a departure is warranted, and the extent of the departure, the court should consider "scientific studies on brain development showing that psychological maturity, which involves impulse control, risk assessment, decision making, and resistance to peer pressure, is generally not developed until the mid-20s."[7]

Mr. Daniel and his brother Max, also a young adult at the time of the offenses, exhibited all the hallmark behaviors reflected in the studies. He and his brother organized the sale of drugs and firearms on three occasions. They weren't caught the first time, so they continued with their

---

[5] Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence*, 58 Am. Psych. 1009, 1012 (2003).

[6] *See id.* at 1016 ("Given the uncertainty of predicting adult character during adolescence, efforts should be made to protect against the iatrogenic effects of incarceration in prison and to invest in the future post-incarceration lives of even serious chronic offenders.").

[7] United States Sentencing Commission, Proposed Amendment: Youthful Individuals (2023).

high-risk behavior. Considering the neuroscience and psychology behind those actions does not excuse Mr. Daniel's behavior, but it does explain it and it should have lessened his culpability at sentencing to a greater extent. But, as explained below, because of the sentencing scheme in effect at the time, the Court was unable to fully consider Mr. Daniel's youth and impose an individualized sentence.

***B. Mr. Daniel has demonstrated meaningful rehabilitation while in prison.***

Although rehabilitation alone cannot warrant a sentence reduction, the revised § 1B1.13(d) makes clear that courts can consider rehabilitation "with other circumstances in determining whether and to what extent a reduction [in sentence] is warranted." In addition to growing up and maturing while in prison—and despite his hopelessly long sentence at such a young age—Mr. Daniel has taken a number of classes and is making slow but steady progress on his GED. (Ex. B.) That progress is especially commendable since Mr. Daniel had a 2.0 GPA in high school, dropped out of school in the 11th grade, and was diagnosed with a learning disability in elementary school. (PSI ¶ 75.) Mr. Daniel, already a talented artist before prison, PSI ¶ 76, has also greatly increased his art skills while incarcerated. He has taken all of the painting classes available to him and enjoys teaching other inmates how to paint when possible as an Art Painting Class Tutor. Mr. Daniel also entered prison with a substance abuse problem; he admitted to using marijuana daily and lacing his marijuana with cocaine a few times a month. (PSI ¶¶ 72-73.) According to his Individualized Needs Plan, Mr. Daniel completed drug education in April 2018. (Ex. B at 2.) Those accomplishments indicate a more mature individual who is capable of good decision-making.

Mr. Daniel had only two misdemeanor convictions for marijuana possession at the time he committed the crimes in this case. He struggled as a young man just leaving his teenage years, fell in with the wrong crowd, and made a series of terrible mistakes. But he has spent the last two

decades trying to better himself, despite receiving a sentence that would otherwise release him, with good time credit, at age 72.

## III. Mr. Daniel qualifies for a sentence reduction under U.S.S.G. § 1B1.13(b)(6).

Pursuant to the version of § 924(c) that was in effect at the time, the Court sentenced Mr. Daniel in 2006 to a total sentence of 720 months as follows:

| Count | Offense | Sentence | Running |
|---|---|---|---|
| 1 | Conspiracy to Deal in Firearms | 60 months | Concurrent |
| 2 | Conspiracy to Distribute Cocaine Base & Marijuana | 60 months | Concurrent |
| 3 | Distribution of Cocaine Base | 60 months | Concurrent |
| 4 | Poss. of Firearm in Furtherance of Drug Trafficking | 60 months | Consecutive |
| 5 | Distribution of Marijuana | 60 months | Concurrent |
| 6 | Poss. of Firearm in Furtherance of Drug Trafficking | 300 months | Consecutive |
| 7 | Distribution of Cocaine Base | 60 months | Concurrent |
| 8 | Poss. of Firearm in Furtherance of Drug Trafficking | 300 months | Consecutive |

(D.E. 279.) At that time, despite Counts 6 and 8 appearing in the same indictment, the Court was required under § 924(c) to treat those two counts as second and subsequent convictions (to Count 4) under the statute, thereby triggering 25-year, consecutive mandatory minimum sentences. In 2004, at Mr. Daniel's first sentencing, the Court described that sentence as an "extraordinarily long sentence." (D.E. 237-1 at 19:13.) The Court further stated that it was only imposing such an extraordinarily long sentence "because it is [the Court's] obligation to do so," and if the Court "had discretion, [it] would do differently." (*Id.* at 19:13-16.)

To address these needlessly lengthy sentences, Congress amended § 924(c) in Section 403 of the First Step Act. Congress clarified its original intent by striking the "second or subsequent conviction under this subsection" language from § 924(c)(1)(C), and adding instead: "violation of this subsection that occurs after a prior conviction under this subsection has become final." As a result, the 25-year mandatory minimum now applies only when a prior § 924(c) conviction is "final," meaning the person was sentenced prior to committing the instant offense. Section 403(a),

132 Stat. at 5221-2. Under Section 403, the 25-year mandatory minimum is "reserved for recidivist offenders, and no longer applies to multiple § 924(c) convictions obtained in a single prosecution." *United States v. Jordan,* 952 F. 3d 160, 171 (4th Cir. 2020).

Section 403 of the First Step Act is precisely the sort of watershed legal change capable of exposing gross disparities and, as such, can be among the circumstances serving as an "extraordinary and compelling reason" to reduce a sentence in particularly compelling cases like Mr. Daniel's. To be sure, not every change in the law falls into this category. But Section 403 of the First Step Act is anything but ordinary: the Senate Judiciary Committee called the First Step Act's reforms "once-in-a-generation." *See* U.S. Senate Comm. on the Judiciary, *Senate Passes Landmark Criminal Justice Reform* (Dec. 18, 2018).[8] There hasn't been a federal statute enacted within the past century that reduced sentencing ranges as dramatically as the First Step Act.

That is not to say that every individual with § 924(c) convictions qualifies for a sentence reduction; section 1B1.13(b)(6) applies only to cases where the defendant is serving an "unusually long sentence," and the defendant can show there is a "gross disparity." Additionally, a defendant also must have already served at least 10 years in prison and must persuade the sentencing court that his particular case is "extraordinary and compelling" based on "full consideration of the his individualized circumstances." This amendment was not intended to—and will not serve to—open some sort of a floodgate for reductions in sentences. But it was intended to allow courts to correct grave injustices visited upon certain people—those whose circumstances, in the totality, are extraordinary and compelling—who received unduly harsh punishments based on an interpretation

[8] *Available at* https://www.judiciary.senate.gov/press/rep/releases/senate-passes-landmark-criminal-justice-reform.

of § 924(c) that Congress has now made clear it never intended. Mr. Daniel is one such person due to his harsh sentence in combination with all the other factors set out above.

Last year, the Court granted in part and denied in part Mr. Daniel's motion to reduce his sentence pursuant to Section 404 of the First Step Act. (D.E. 355.) Finding that Eleventh Circuit precedent foreclosed the Court from modifying his sentence on non-covered offenses, the Court reduced Mr. Daniel's sentence on each of the crack-cocaine related counts from 60 months to 1 day (Counts 2, 3, and 7). (D.E. 356.) His total sentence remained 720 months, however, because he still had 60-month sentences on Counts 1 and 5.

Were Mr. Daniel sentenced today on Counts 4, 6, and 8, he would be facing a mandatory minimum sentence of 180 months instead of the 660 months he received originally. That is a gross disparity. Reducing counts 6 and 8 from 300 months each to 60 months each would reduce his current sentence from 720 to 240 months. A sentence of 240 months, with good-time credit, translates into a sentence of 204 months. Mr. Daniel has already served 262 months in prison.

## IV. The Amended § 1B1.13, including subsection (b)(6) is a valid and binding exercise of the Sentencing Commission's Authority.

In the recent past, the United States has argued that the Sentencing Commission lacked the authority to enact § 1B1.13(b)(6). Undersigned counsel has conferred with the United States and it appears that they intend to continue to do so. That argument is wrong for the following reasons.

### *A. The entirety of Section 1B1.13, including subsection (b)(6), is binding authority on the district courts deciding motions under § 3582(c)(1)(A).*

As of now, § 1B1.13(b)(6) is *binding* on district courts. The Eleventh Circuit said as much in *Bryant*—which dealt with the prior iteration of this exact section of the guidelines—noting that "both the Supreme Court and this Court have held that Congress's consistent-with requirement makes the relevant policy statements binding on district courts." *Bryant*, 996 F.3d at 1251–52. It

went on to explain that "[a]lthough [§ 3582(c)(1)(A)] charges courts with making the discretionary call about whether a sentence should ultimately be reduced, the Commission is tasked with defining the universe of 'extraordinary and compelling circumstances.'" *Id*. at 1255. The government's briefing in *Bryant* urged that precise holding. *See* Br. of Appellee, *United States v. Bryant*, 996 F.3d 1243 (11th Cir 2021), 2020 WL 2766026, at *9 (arguing that "Congress did not define what constitutes 'extraordinary and compelling circumstances' for purposes of § 3582(c)(1)(A), but rather delegated that authority to the Sentencing Commission . . . Accordingly, the relevant policy statement of the Commission is binding on the Court.").

The Eleventh Circuit's decision in *Bryant* remains binding precedent. As such, the Commission's recent description of what constitutes an extraordinary and compelling reason for a sentence reduction binds district courts—just as it always has.

### *B. The government has previously acknowledged the precise exercise of Commission authority it now rejects.*

Any argument by the United States that the Sentencing Commission now *lacks* the authority to decide whether non-retroactive changes in sentencing law could be considered extraordinary and compelling reasons would directly contradict the government's previously held positions in the circuit courts and in the United States Supreme Court.

In those earlier filings, the government urged courts to deny motions like Mr. Daniel's because the *Commission* (and not the courts) should decide whether non-retroactive changes in sentencing law could be considered extraordinary and compelling reasons justifying the reduction of unusually long sentences. As noted above, the Eleventh Circuit agreed, holding in *Bryant* that the Commission's then-current policy statement controlled all motions brought under § 3582(c)(1)(A)(i). All other circuits to address the issue concluded that the then-existing policy statement was not applicable to inmate-filed motions, but split on whether courts could consider

unusually long sentences as a basis for a sentence reduction, when intervening changes in the law would produce much lower sentences at the time of the motion. Five circuits held they could, while six others disagreed, reasoning that, at least in the absence of an applicable policy statement from the Commission governing inmate-filed motions, sentence length and non-retroactive changes to sentencing law were not valid bases for relief.

When that disagreement reached the Supreme Court, the government successfully urged the Supreme Court on numerous occasions not to decide whether "extraordinary and compelling" circumstances could include non-retroactive changes in the law because, according to the government, the Commission should resolve it. *See, e.g.*, Br. for the United States in Opp'n at 2, *Thacker v. United States* (No. 21-877) ("[T]he Sentencing Commission could promulgate a new policy statement that deprives a decision by this Court of any practical significance."); Br. for the United States in Opp'n at 2, *United States v. Williams* (No. 21-767) (same); Br. for the United States in Opp'n at 2, *United States v. Watford* (No. 21-551) (same). The government relied on *Braxton v. United States*, 500 U.S. 344, 348 (1991), which held that given its "statutory duty 'periodically [to] review and revise the Guidelines,' 28 U.S.C. § 994(o)," courts should not resolve disagreements of this kind and instead let the Commission do so. The government explicitly acknowledged that the Commission had both the authority and the responsibility to resolve the circuit split, emphasizing the "particularized and express congressional preference for Commission-based decision making on the specific issue of what should be considered extraordinary and compelling reasons." Br. for United States in Opp'n at 20, *Jarvis v. United States* (No. 21-568). In enacting the current policy statement, the Commission exercised exactly the authority the government cited when it persuaded the Supreme Court to deny review.

### *C. Congress approved the amendments to § 1B1.13.*

Congress expressly delegated to the Sentencing Commission the task of determining what circumstances should be considered "extraordinary and compelling" within the meaning of 18 U.S.C. § 3582(c)(1)(A). This sort of express delegation is governed by *Batterton v. Francis*, 432 U.S. 416 (1977). Accordingly, § 1B1.13(b)(6) is "entitled to more than mere deference or weight. It can be set aside only if the [Sentencing Commission] exceeded [its] statutory authority or if the regulation is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Batterton*, 432 U.S. at 426. There is no colorable argument that such an impermissible action was taken here.

i. <u>Congress had an opportunity to review and disapprove the guidelines amendments before they took effect; they did not.</u>

As an initial matter, it bears noting that the new policy statement was not promulgated in a vacuum. The Sentencing Commission submitted its proposed amendments to Congress, after extensive comment and review, and Congress could have disapproved or rejected any portion of the proposed guidelines amendments if it believed they were contrary to its intent or the statutory delegation of authority under § 3582. But Congress took no action to amend or override any of the Commission's proposed amendments—including the amendments to § 1B1.13, at issue here—which suggests implicit approval. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 801–802 (2014) (Congress "retain[ed]" through inaction Court's interpretation of sovereign immunity and therefore the interpretation warranted deference); *Kimbrough v. United States*, 552 U.S. 85, 106 (2007) (finding "tacit acceptance" by Congress where it "failed to act on a proposed amendment to the Guidelines in a high-profile area in which it had previously exercised its disapproval authority under 28 U.S.C. § 994(p)"); *CBS, Inc. v. F.C.C.*, 453 U.S. 367, 385 (1981) ("Congress' failure to repeal or revise [the statute] in the face of such administrative interpretation [is] persuasive evidence that that interpretation is the one intended by Congress."); *Red Lion Broad.*

*Co. v. F.C.C.*, 395 U.S. 367, 381 (1969) (specifying that "construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress has refused to alter the administrative construction").

In other words, Congress—the entity responsible for drafting § 3582(c)(1)(A) and delegating to the Commission the authority to describe what sort of circumstances might constitute "extraordinary and compelling reasons" warranting a sentence reduction—signed off on the new amendments that the government intends to challenge as improper and contrary to statutory intent.

ii. <u>Section 1B1.13(b)(6) does not conflict with § 3582(c)(1)(A)'s text.</u>

Section 3582(c)(1)(A) was enacted by Congress in 1984 to serve as a safety valve within the Sentencing Reform Act. It gave courts the authority to reduce sentences after they became final for "extraordinary and compelling reasons," and delegated to the Sentencing Commission the task of determining the types of reasons that might qualify someone for relief under that provision. Indeed, in the same Act that created § 3582(c)(1)(A), Congress specifically directed the Commission to promulgate "policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in 3582(c)" and to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. §§ 994(a)(2)(C) and (t). The only limitation Congress placed on the Commission is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

It has long been acknowledged that, under the "preeminent canon of statutory interpretation," "the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) (cleaned up). Applying that principle here, it is clear that Congress intended the Sentencing Commission to do precisely what

it did in the most recent round of guidelines amendments; to promulgate a list of examples to guide courts in determining what qualifies as an extraordinary and compelling reason warranting a sentence reduction under § 3582(c)(1)(A). And the plain language of 28 U.S.C. § 994 further makes clear that Congress intended to place no categorical prohibitions on the Commission's description of what should be considered "extraordinary and compelling," other than that "rehabilitation . . . alone" cannot justify a sentence reduction.

There is no other basis for reading categorical prohibitions into § 3582(c)(1)(A), beyond the "rehabilitation alone" prohibition. As the Supreme Court held just last year: "It is only when Congress or the Constitution limits the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence, that a district court's discretion to consider information is restrained." *Concepcion v. United States*, 597 U.S. 481, 486–87 (2022). And, as the Ninth Circuit reasoned in *United States v. Chen*, 48 F.4th 1092, 1099 (9th Cir. 2022), "[s]ince Congress has not legislated to create a third limitation on extraordinary and compelling reasons prohibiting district courts from considering non-retroactive changes in sentencing law," courts should not do so on their own. *See also Concepcion*, 597 U.S. at 497 ("Drawing meaning from silence is particularly inappropriate in the sentencing context, for Congress has shown that it knows how to direct sentencing practices in express terms.") (cleaned up).

iii. <u>Nothing about the words "extraordinary and compelling" excludes circumstances that are related to legal changes.</u>

The words "extraordinary" and "compelling" afford the Commission significant discretion in setting policy, and that is intentional. Though this avenue for relief was long referred-to as "compassionate release," the Sentencing Commission has made clear that is somewhat of a misnomer, clarifying that the types of circumstances that qualify someone for a reduction under § 3582(c)(1)(A) go beyond the sorts of health-and-age-related matters that would be covered by a

traditional "compassionate release" statute. U.S.S.G. App. C, Amend. 814, Reason for Amendment (Nov. 1, 2023) (explaining that § 3582(c)(1)(A) has come to be known as "compassionate release," although that phrase appears nowhere in the Sentencing Reform Act). In the same vein, nothing about those terms exclude, as a category, legal changes as they might relate to a constellation of circumstances warranting a sentence reduction. *See Kemp v. United States*, 596 U.S. 528, 540 (2022) (Sotomayor, J., concurring) (explaining in the Fed. R. Civ. P. 60(b)(6) context that "extraordinary circumstances" include "a change in controlling law").

At least four courts of appeal have held in the § 3582(c)(1)(A) context that "extraordinary and compelling" is capable of encompassing some circumstances relating to some legal changes, including the changed mandatory minimums under 18 U.S.C. § 924(c) to which Mr. Daniel was subjected. *United States v. Trenkler*, 47 F.4th 42 (1st Cir. 2022); *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020); *Chen*, 48 F.4th 1092; *United States v. McGee*, 992 F.3d 1035 (10th Cir. 2021). These opinions came out of the period after Congress authorized defendants to file their own § 3582(c)(1)(A) motions, but before the Sentencing Commission had amended § 1B1.13 to account for that. Since the amendments took effect, courts have continued to grant relief based on non-retroactive changes in law, including the changes to § 924(c), under the new § 1B1.13(b)(6). *See, e.g.*, *United States v. Ramirez*, No. 2:00-CR-105-3 TS, 2024 WL 54429 (D. Utah Jan. 4, 2024); *United States v. Riley*, No. CR-11-235, 2023 WL 8600496 (E.D. La. Dec. 12, 2023); *United States v. Howard*, No. CR-ELH-13-0629, 2024 WL 112010, (D. Md. Jan. 10, 2024).

Mr. Daniel is not claiming that the First Step Act bestowed new authority on the Sentencing Commission. But neither did it restrict the Commission's authority—established by the Sentencing Reform Act—to describe what could be considered "extraordinary and compelling reasons," and to review and revise its description, § 994(o), (t); to resolve circuit splits, § 994(o); to establish

policies and practices that promote the statutory purposes of sentencing, § 991(b)(1)(A); and to reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process, § 994(b)(1)(C). That is what the Commission has done in promulgating § 1B1.13, including subsection (b)(6).

iv. Nothing about the district court following the binding policy statement implicates separation of powers concerns.

Congress enacted § 3582(c)(1)(A) and the President signed it into law. That law delegated the authority to describe the types of "extraordinary and compelling" circumstances that might fall within the statute's ambit to the Sentencing Commission, and the Commission, once it had a quorum, fulfilled that duty. The proposal from the Commission was then sent to Congress, which made no changes, before the new guideline took effect and became binding guidance to the judiciary. That is *precisely* how the system is supposed to work, and exemplifies the relative roles of the executive, legislative, and judicial branch in promulgating, interpreting, and enforcing the law. The Court should follow the policy statement as Eleventh Circuit law requires.

v. This Court, like many district courts in the Eleventh Circuit, has already rejected the Government's argument about the validity of (b)(6).

The Court recently "joined the chorus of other district courts in this Circuit" when it rejected the government's argument in *United States v. Adley* that the Sentencing Commission was without authority to enact subsection (b)(6). *See* Case No. 03-20678-CR-Altonaga, D.E. 966 at 7 (S.D. Fla. May 3, 2024) (citing cases rejecting government argument regarding invalidity of subsection (b)(6)). In *Adley*, the Court held that § 1B1.13(b)(6) was valid because, *inter alia*, Congress—by statute—specifically directed the Commission to adopt a *binding* policy statement that defines "extraordinary and compelling." Now that the Sentencing Commission has done so through the adoption of subsection (b)(6), the Court was "following the consistent decree of the

Sentencing Commission" by applying the binding definitions therein. *Id.* Judge Cohn, in *United States v. Joseph*, has also recently rejected the government's position for substantially the same reasons as this Court. Case No. 12-CR-60110-Cohn, D.E. 99 at 12-13 (S.D. Fla. May 15, 2024) (citing cases). In the absence of binding precedent, the Court should continue to do so.

## V. Mr. Daniel is not a danger and the § 3553(a) factors weigh heavily in favor of relief.

Mr. Daniel's prior Amended Motion to Reduce Sentence (D.E. 349) detailed many of the individualized circumstances and rehabilitative efforts undertaken during his incarceration, which, combined with the § 3553(a) factors, justify relief.[9] For the Court's convenience, those arguments are included below.

First, Mr. Daniel does not present a danger to the public. Mr. Daniel has no history of violence. The § 924(c) counts that the Court sentenced him on were not related to crimes of violence but rather drug distribution offenses. He has no criminal convictions or arrests—as an adult or juvenile—involving violence. His entire criminal history involves three misdemeanor convictions—two for marijuana possession and one for resisting without violence—and one arrest at age 14 for trespass of a conveyance that the state *nolle prossed* after Mr. Daniel completed a diversionary program. (PSI ¶¶ 50-54.)

Second, at the time of his sentencing, Mr. Daniel was in Criminal History Category II. Since his sentencing, not only has § 924(c) been amended, but local, state, and federal law has changed dramatically with respect to marijuana laws. The two points that made him a Category II offender stem from two misdemeanor marijuana possession cases when he was only 19. In the first, he was found with two marijuana cigarettes, pled no contest, and was fined. (PSI ¶ 51.) In

[9] While the Court was not required to consider the § 3553(a) factors on Mr. Daniel's Section 404 motion, the Government's Response to that Amended Motion, D.E. 350, never responded to Mr. Daniel's § 3553(a) argument.

the second, he was found with two grams of marijuana, pled guilty, and was sentenced to credit time served. (PSI ¶ 52.) He spent a total of two days in jail.

Today, if caught with two marijuana cigarettes or two grams of marijuana, it is unlikely that Mr. Daniel would be arrested, let alone convicted of a crime. In June 2015, Miami-Dade County commissioners, by a vote of 10-3, passed a county ordinance that allows police the option not to arrest those caught with less than 20 grams of marijuana and instead write a civil citation.[10]

Likewise, the Department of Justice and the Sentencing Commission now approach marijuana possession differently than in the past. President Biden recently announced that he intends to pardon people convicted of federal marijuana possession offenses and ordered the DOJ to begin the process of reclassifying marijuana as a Schedule III controlled substance (like codeine) instead of a Schedule I controlled substance.[11] In that same spirit, the Sentencing Commission recently amended the commentary to U.S.S.G. § 4A1.3 to suggest that a downward departure may be warranted where a defendant received criminal history points from a sentence for possession of marijuana for personal use. U.S.S.G. § 4A1.3, comment. (n.3(A)(ii)). That addition was based in part on a multi-year study by the Sentencing Commission on marijuana possession.[12]

Criminal History Category II over-represents the seriousness of Mr. Daniel's criminal history. Today, whether by downward departure or non-prosecution by the state, Mr. Daniel would likely be a Category I offender. The Court can and should take this into account when considering the § 3553(a) factors.

---

[10] *See* Miami-Dade County, Fla. Ordinances, Sec. 21-81(d)(6) (adopted June 2015).

[11] DOJ Press Release, May 16, 2024, available at: https://www.justice.gov/opa/pr/justice-department-submits-proposed-regulation-reschedule-marijuana.

[12] U.S. Sentencing Commission, Weighing the Impact of Simple Possession of Marijuana, Jan. 10, 2023, available at: https://www.ussc.gov/research/research-reports/weighing-impact-simple-possession-marijuana.

Third, any specific concerns related to potential recidivism are addressed by the Court's imposition of a four-year term of supervised release. The standard and special conditions of supervised release imposed by the Court are designed to address the potential risk factors that may accompany someone who committed the crimes that he did—Mr. Daniel is prohibited from possessing a firearm; he is prohibited from using or possessing drugs; he is subject to punishment for violating state or federal laws separate and apart from the punishment prescribed by those laws; he is required to participate in additional drug abuse treatment programs as directed by U.S. Probation; and his person or property is subject to search by U.S. Probation.

Fourth, Mr. Daniel has made significant efforts at rehabilitation and shown significant progress over the last twenty years. He has learned the value of employment and consistent work. He has gone from an unemployed twenty-year-old at the time of his arrest to someone who has worked throughout his time in prison. He is currently a recreation specialist. (*See* Ex. B at 1.) Twenty years of work in a penitentiary is not easy and demonstrates a positive work ethic that he will take with him into society. He is ready to rejoin and be a productive member of society.

Finally, Mr. Daniel has a release plan that will help his reintegration into society. As mentioned in his request to the Warden, Mr. Daniel plans to live with his father, Mark Daniel, in his two-bedroom apartment in Coral Springs, Florida. Mr. Daniel's father is employed as a prep cook. Undersigned counsel has spoken with him, and he confirmed that he is ready and able to welcome his son back into his home. He also plans to assist Mr. Daniel financially until he finds employment. Mr. Daniel's mother, Ann Daniel, also lives in south Florida and will be part of his support network. While in prison, Mr. Daniel took several educational courses, focusing mainly on art, tooling, and plumbing. He hopes to use those skills when he is released. His father also confirmed that he will be able to use his car to travel to and from job interviews and work.

***

Undersigned counsel has conferred with AUSA Alicia Shick. She indicated that the United States intends to oppose this motion.

**CONCLUSION**

Whether under U.S.S.G. §§ 1B1.13(b)(5) or (b)(6), the fact remains that Mr. Daniel's case presents extraordinary and compelling reasons for a sentence reduction. Mr. Daniel has served almost 22 years of a 60-year sentence for crimes he committed when he was twenty-years old. Due to the amendment to § 924(c) and society's changed views on marijuana possession, Mr. Daniel's potential sentence today would be drastically different than it was in 2006. The resulting gross disparity, combined with his rehabilitative potential and actual rehabilitation, makes him eligible and deserving of a chance to rejoin his community and his family.

At Mr. Daniel's post-*Booker* resentencing, the Court lamented that it "continues to have the firm belief and conviction that these sentences are excessive," but that the Court still had "no discretion to do anything other than announce the sentences" that it imposed. The Court was ahead of its time: the Court both recognized that Mr. Daniel was not irredeemable and knew that the law required it to impose an excessive sentence as if he was. Today, based on decades of research on adolescent and young adult brains, as well Mr. Daniel's own rehabilitative efforts in prison, we know that he—like almost all young people—can change and mature and become a different, better person. And today, based on changes in law and to the sentencing guidelines, the Court now has the discretion and legal authority to impose an individualized sentence that is adequate but not excessive.

Mr. Daniel respectfully asks this Court to grant his motion and reduce his sentence to time served or, in the alternative, 240 months.

Respectfully Submitted,

**HECTOR A. DOPICO**
**INTERIM FEDERAL PUBLIC DEFENDER**

*s/ Andrew S. Jacobs*
Andrew S. Jacobs
Assistant Federal Public Defender
Florida Special Bar No. A5502687
150 W. Flagler St., Ste. 1700
Miami, FL 33130
305-533-4201
Andrew_Jacobs@fd.org

**CERTIFICATE OF SERVICE**

I HEREBY certify that on May 20, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: *\/s/ Andrew S. Jacobs*
Andrew S. Jacobs