**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 02-CR-20676-ALTONAGA**

**UNITED STATES OF AMERICA**

**v.**

**RICHARD DANIEL,**

**Defendant.**
______________________________/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO THE**
**DEFENDANT'S MOTION TO REDUCE SENTENCE (DE 377)**

The Court should deny Defendant Richard Daniel's ("Defendant" or "Daniel") motion for a sentencing reduction based on § 1B1.13(b)(5) and (b)(6). Defendant's argument for eligibility under (b)(5) is unavailing and a misreading of the policy statement. And notwithstanding the government's position regarding the invalidity of (b)(6), Defendant is not entitled to compassionate release. Defendant's multiple firearm convictions in connection with his drug trafficking support a finding of dangerousness, thereby precluding relief under § 1B1.13. Alternatively, Defendant's § 3553(a) factors weigh against relief. Defendant's disciplinary record—which includes drug possession and violence—demonstrates he cannot follow the law and has not been rehabilitated as he claims. Tellingly, Defendant did not include, nor mention, his twenty-seven (27) infractions in his motion for relief. Therefore, even if the Court finds Defendant is eligible for a sentencing reduction under Subsection (b)(6), the Section 3553(a) factors preclude relief.

## BACKGROUND

Defendant and his brother were members of a violent street gang called the "Terrorist Boyz'" (PSI ¶¶ 14, 17). They sold multiple firearms, crack cocaine and marijuana to a confidential

informant ("CI") on multiple occasions. In total, the Alcohol Tobacco and Firearms ("ATF") agents seized twelve (12) firearms sold by the Daniel brothers; five (5) of which were loaded and nine (9) of which Daniel and his coconspirators had stolen from a gun shop in Broward County (PSI ¶ ¶ 14-15). Daniel and his coconspirators burgled a total of thirty-three (33) firearms from the gun shop, some of which were sold, and others kept by the defendants. *Id.* (Max Daniel admitted that "Daniel, Toussaint and other Terrorist Boyz' members committed the Martin's Broward Gun Shop burglary where they used stolen vehicles to travel and crash into the gun shop")*; see also* (DE 268:6) ("Subsequent to the pawn shop burglary, Richard was stopped, and a weapon stolen from the pawn show was discovered on him."). Several of the stolen firearms were assault weapons, including an Iver-Johnson MI .30 caliber semi-automatic assault rifle with a pistol grip, and a SKS 7.62 X 39mm assault rifle, which Daniel sold to the CI (PSI ¶ ¶ 5, 15). Daniel and his codefendants did more than just sell these weapons to a known drug dealer. They took the further step of attempting to make their guns fully automatic (PSI ¶ ¶ 9-10). Moreover, Daniel carried his own firearm for protection during his drug deals with the CI and others (PSI ¶ 14).

A jury found Defendant guilty on all counts charged in the indictment and specially found as to Counts 2, 3, and 7, he distributed five (5) grams or more of cocaine base (DE 188). The Court entered a judgment on June 18, 2004 (DE 217) and imposed a 768-month sentence under the then-mandatory guidelines. Subsequently, on August 31, 2006, the Court entered an amended judgment under the newly permissive guidelines (DE 279) and sentenced the Defendant to 720 months by reducing the 108-month guideline sentence for the crack-cocaine offenses in Counts 2, 3, and 7 to what was then the statutory minimum, as follows:

| Count | Offense | Sentence | Running |
|---|---|---|---|
| 1 | Conspiracy to Deal in Firearms | 60 months | Concurrent |
| 2 | Conspiracy to Distribute Cocaine Base and Marijuana | 60 months | Concurrent |
| 3 | Distribution of Cocaine Base | 60 months | Concurrent |
| 4 | Possession of Firearm in Furtherance of Drug Trafficking | 60 months | Consecutive |
| 5 | Distribution of Marijuana | 60 months | Concurrent |
| 6 | Possession of Firearms in Furtherance of Drug Trafficking | 300 months | Consecutive |
| 7 | Distribution of Cocaine Base | 60 months | Concurrent |
| 8 | Possession of Firearms in Furtherance of Drug Trafficking | 300 months | Consecutive |

In January 2020, Defendant filed a *pro se* Motion to Reduce Sentence (DE 333) under the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ("First Step Act"). In his motion, Defendant argued he was sentenced under a "stacking" theory for offenses under Section 924(c) that the First Step Act has since abrogated.[1] The Government responded in opposition, arguing that the FSA's revision to the stacking provision did not apply retroactively to Defendant (DE 336). Agreeing with the government, the Court denied Defendant's motion (DE 337).

[1] Title 18, United States Code, Section 924 imposes a five-year mandatory minimum for a defendant's first firearm "conviction," 18 U.S.C. § 924(c)(1)(A)(i), and a consecutive 25-year mandatory minimum for a defendant's second "conviction," 18 U.S.C. §§ 924(c)(1)(C)(i), 924(D)(ii). The Supreme Court has interpreted the term "conviction" to mean the "finding of guilt that necessarily precedes the entry of a final judgment of conviction." *Deal v. United States*, 508 U.S. 129, 133 (1993). Under this interpretation, if a defendant was charged with and convicted of multiple violations of 18 U.S.C. § 924 by the same indictment, the 25-year mandatory minimum would be "stacked" on top of the five-year mandatory minimum. *See United States v. Whitehead*, 605 F. App'x 888, 891 (11th Cir. 2015).

On December 21, 2018, Congress enacted the First Step Act to "eliminate[] 18 U.S.C. § 924(c)'s stacking provision." *United States v. Griffin*, No. 1:95-CR-00751-UU, 2019 WL 6607259, at *2 (S.D. Fla. Oct. 1, 2019). Section 403 of the First Step Act amended 18 U.S.C. § 924 to clarify that a defendant's first conviction must be "final" before the 25-year mandatory minimum applies to the defendant's second conviction. First Step Act, Pub. L. 115-391, tit. IV, § 403(b), 132 Stat. 5194, 5222 (2018). Congress did not intend for Section 403 to apply retroactively. Rather, Section 403 "appl[ies] to any offense that was committed before the date of enactment of this Act, if a sentence of the offense has not been imposed as of such date of enactment." First Step Act of 2018, Pub. L. 11-391, tit. IV, § 403(b), 132 Stat. 5194, 5222. In other words, "the First Step Act was only made retroactively applicable to offenders who were not sentenced as of December 21, 2018." *In re Green*, No. 10-10633-D, 2019 U.S. App. LEXIS 7268, *3 (11th Cir. Mar. 12, 2019).

Although Defendant initially filed an uncounseled additional motion to reduce his sentence in December 2022 (DE 338), the Court appointed the Federal Public Defender, who opted to file an Amended Motion to Reduce (DE 349). In his motion, Defendant argued the Supreme Court's holding in *Concepcion v. United States*, 142 S. Ct. 2389 (2022) and the Eleventh Circuit's decision in *United States v. Hunt*, 2022 WL 4115308 (11th Cir. 2022) dictate the result he sought—a resentencing as to all Counts of conviction, including his non-covered offenses. Indeed, Defendant argued "there is nothing in Section 404 of the First Step Act that precludes the Court from finding that resentencing Mr. Daniel on his covered offenses requires resentencing on his non-covered offenses as well including the § 924(c) counts" (DE 349:11).

The Court, again agreeing with the government, held that it could not resentence Defendant on the non-covered defenses, but that it could resentence him on the covered offenses, which would not alter his ultimate sentence. Accordingly, the Court resentenced Defendant to 720 months' imprisonment as follows:

| Count | Offense | Sentence | Running |
|---|---|---|---|
| 1 | Conspiracy to Deal in Firearms | 60 months | Concurrent |
| 2 | Conspiracy to Distribute Cocaine Base and Marijuana | 1 day | Concurrent |
| 3 | Distribution of Cocaine Base | 1 day | Concurrent |
| 4 | Possession of Firearm in Furtherance of Drug Trafficking | 60 months | Consecutive |
| 5 | Distribution of Marijuana | 60 months | Concurrent |
| 6 | Possession of Firearms in Furtherance of Drug Trafficking | 300 months | Consecutive |
| 7 | Distribution of Cocaine Base | 1 day | Concurrent |
| 8 | Possession of Firearms in Furtherance of Drug Trafficking | 300 months | Consecutive |

(DE 355).

Defendant returns to the Court seeking to reduce his sentence on his non-covered offenses, but this time under the new amendments to the Sentencing Guidelines, § 1B1.13(b)(5) and (b)(6). Defendant contends the "constellation of unique circumstances—including, but not limited to, his young age at the time he committed the underlying offenses, his struggles with drug and alcohol

addiction that he worked to overcome while in prison, his lack of any prior felony convictions, the substantial time he has already served, as well as the overly harsh mandatory sentence he received that he would not receive today—collectively rise to the level of warranting relief." (DE 377:2).

Defendant mischaracterizes his entitlement to relief pursuant to § 1B1.13. On the contrary, he is ineligible for relief under subsection (b)(5) because he does not present any facts about his physical wellbeing or the wellbeing of his family, nor does he argue any negative circumstances that his release would alleviate. He is likewise ineligible under (b)(6)—presuming its validity—as his dangerousness precludes compassionate release. Alternatively, his Section 3553(a) factors—to include his lengthy disciplinary record and lack of rehabilitation—counsel against a sentencing reduction. Accordingly, the Court should deny his motion.

## LEGAL STANDARD

Under section 3582(c)(1)(A)(i), Congress enacted a narrow exception to permit the courts to reduce a term of imprisonment (1) if the defendant demonstrates there are "extraordinary and compelling reasons" for a sentence reduction or the defendant is at least 70 years old and has served at least 30 years in prison; (2) the relief is consistent with the Commission's relevant policy statements in U.S.S.G. § 1B1.13 and the applicable 18 U.S.C. § 3553(a) factors; and (3) the defendant is not a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g).[2] Congress directed the Commission to "describe what should be considered

[2] The 18 U.S.C. § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to accomplish certain aims, such as to reflect the seriousness of the offense, afford adequate deterrence, protect the public, or the defendant's educational, medical, or correctional treatment needs; (3) the kinds of sentences available; (4) the applicable sentencing range under the guidelines; (5) any pertinent Sentencing Commission policy statement; (6) the need to avoid unwanted disparities among defendants; and (7) the need to provide restitution to any victim of the offense. 18 U.S.C. § 3553(a); *see also United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020) ("compassionate

extraordinary and compelling reasons." 28 U.S.C. § 994(t). On November 1, 2023, the Commission amended the policy statement to six categories that could constitute extraordinary and compelling reasons for a sentence reduction: (1) medical circumstances of the defendant; (2) age of the defendant; (3) family circumstances of the defendant; (4) victim of abuse; (5) other reasons; and (6) unusually long sentence. U.S.S.G. § 1B1.13(b).

As relevant here, subsection (b)(6) provides that "[i]f a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances."

Additionally, the defendant bears the burden of establishing that compassionate release is warranted. *See United States v. Hamilton,* 715 F.3d 328, 337 (11th Cir. 2013) (in the context of a motion to reduce under § 3582(c)(2)); *United States v. Lonergan*, 2022 WL 426487, at *5 (S.D. Fla. Feb. 11, 2022).

Notably, in this circuit, courts may not reduce a sentence under Section 3582(c)(1)(A) unless a reduction would be consistent with § 1B1.13. *See United States v. Bryant*, 996 F.3d 1243, 1262 (11th Cir. 2021) ("[W]e hold that [§] 1B1.13 is an applicable policy statement that governs all motions under Section 3582(c)(1)(A). Accordingly, district courts may not reduce a sentence under Section 3582(c)(1)(A) unless a reduction would be consistent with [§] 1B1.13.").

---

release is discretionary, not mandatory, and c[an] be refused after weighing the sentencing factors of 18 U.S.C. [section] 3553(a).") (alterations added).

## ARGUMENT[3]

### I. Defendant' Reliance on (b)(5) Is Misplaced

Defendant points to the government's recent agreement to recommend a sentence reduction under § 1B1.15(b)(5) in a case before Judge Middlebrooks as support for his entitlement to a reduction under the same subsection. *See* Exhibit "B" (Judge Middlebrooks Order, *United States v. Gomeo Rodriguez*, Case No. 97-00162-CR-Middlebrooks (S.D. Fla. Jan. 9, 2024) (DE 264)). Defendant's reliance on subsection (b)(5) is improper. Notably, Judge Middlebrooks specifically found Mr. Rodriguez was not entitled to relief under (b)(5), but instead believed he was entitled to relief under (b)(6). *See id.* at 5.

The Sentencing Commission replaced Application Note 1(D) with the Other Reasons provision, which states in full: "The defendant presents any other circumstances or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." § 1B1.13(b)(5) (2023). The reasons described in paragraphs (1) through (4) remain the same in type as the former statements and include when the defendant is suffering from or is at risk of a terminal or serious medical condition, the defendant is at least 65 years old and experiencing a serious deterioration in physical or mental health, the defendant's family circumstances require him to be a caregiver, and the defendant suffered abuse in custody. Judge Middlebrooks found:

> Congress made a 'determined choice,' *United States v. Jordan*, 915 F.2d 622, 628 (11th Cir. 1990), that the Commission, not the courts, would continue to establish what reasons were extraordinary and compelling for Section 3582(c)(1)(A)

---

[3] While the government agrees Defendant has exhausted his administrative remedies, Defendant misstates that the warden has not replied. *See* (DE 377:2). The warden responded the next day on November 7, 2023, denying Defendant's request. *See* Exhibit "A" (Warden's Denial – November 7, 2023).

> motions." *Bryant*, 996 F.3d at 1259. "If Congress had meant to free district courts from following the Commission's guidance for defendant-filed motions, "we would expect the text . . . to say so." *Id.* citing *Puerto Rico v. Franklin Cal. Tax-Free Trust*, ___ U.S. ___, 136 S.Ct. 1938, 1947 (2016). I am bound to follow the Commission's guidance in their policy statements.

*Id.* at 4-5. [4]

Judge Middlebrooks concluded that none of the reasons set forth in (1) through (4) "appl[ies] to Mr. Rodriguez." *Id.* at 5. "While the Other Reasons provision includes the catch-all [ ]'any other circumstances or combination of circumstances,' ***it limits those circumstances to those 'similar in gravity to those described in paragraphs (1) through (4).***'" *Id.*, citing, §1B1.13(b)(5) (2023) (emphasis added). Judge Middlebrooks held the statutory interpretation cannon of *ejusdem generis* required him to consider the "specific terms that precede a general catch-all term," and the "Other Reasons provision explicitly requires that the circumstances for relief be similar in gravity to those that precede it." *Id.*, citing *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991). Judge Middlebrooks thus concluded that a defendant must have some external, specific factor or need that requires his/her release, which can only include: "a terminal illness or serious medical condition, deterioration caused by age, the necessity to be a caretaker to a family member, and victimization while in custody." *Id.* Therefore, because the parties did "not present any facts about Mr. Rodriguez's physical wellbeing or the wellbeing

---

[4] The undersigned Assistant U.S. Attorney is the one who recommended the government agree to a sentencing reduction for Mr. Rodriguez because of his extraordinary rehabilitation and impeccable and impressive record while incarcerated. The government, however, stands by its position that the Sentencing Commission lacked authority to promulgate subsection (b)(6), and therefore recommended Judge Middlebrooks reduce Mr. Rodriguez' sentence pursuant to subsection (b)(5). As more fully articulated above, Defendant's similarity to Mr. Rodriguez lies in his 924(c) stacked sentences. This is where the similarity ends. Mr. Rodriguez's "unique record of rehabilitation" is the sole reason the government agreed to a sentence reduction and Judge Middlebrooks granted it. Mr. Rodriguez' extraordinary and compelling rehabilitation stands in stark contrast to Defendant's criminal history and lack of rehabilitation. *See* Exhibit A at 8.

of his family, nor stated any negative circumstances that his release would alleviate" relief under (b)(5) was not appropriate. *Id.* at 5, 8.

Like Mr. Rodriguez, Defendant does not have, nor does he allege, any specific circumstances regarding his physical wellbeing or that of his family, nor any negative circumstances that his release would alleviate. Therefore, he is not entitled to relief under subsection (b)(5).

Alternatively, if the Court disagrees with Judge Middlebrooks and the government and finds Defendant eligible for relief under subsection (b)(5), Defendant's dangerousness and Section 3553(a) factors, discussed *infra*, preclude compassionate release under either subsection (b)(5) or (b)(6).

## II. The Sentencing Commission Exceeded Its Authority in Promulgating (b)(6)

Defendant argues his entitlement to a sentencing reduction under subsection (b)(6) because if sentenced today, he would receive a far lesser sentence. Defendant is correct that under the new sentencing regime for 924(c) stacking, he would be facing a mandatory minimum sentence of 180 months versus 660 months. And the Court having already reduced Defendant's covered offenses to 1 day, if sentenced today, Defendant's total sentence would be 240 months. However, the Sentencing Commission exceeded its authority in promulgating subsection (b)(6).

Defendant argues that subsection (b)(6) is a valid exercise of the Commission's authority. At least one district court judge in this district agrees with the government's position that the Commission exceeded its authority in promulgating subsection (b)(6). *See, e.g., United States v. Vasquez*, Case No. 13-14063-CR-Martinez (DE 147) and *United States v. Mobley*, Case No. 08-20023-CR-Martinez (DE 168) ("[T]he Court agrees with the Government that U.S.S.G. § 1B1.13(b)(6), wherein the Sentencing Commission purported to interpret 18 U.S.C.

§ 3582(c)(1)(A)(i) to permit changes in the law to establish extraordinary and compelling reasons for a sentence reduction in some circumstances, is contrary to the statute's text, structure, and purpose. . . . Section 3582(c)(1)(A) does not authorize sentence reductions based on changes in the law, either alone or in combination with other factors.") (Composite Exhibit "C").

The government is currently appealing this issue to the Eleventh Circuit. *See United States v. Rizo*, Case No. 96-00075-CR-Cohn (Apr. 2024). The government's brief is due July 10, 2024. Relatively soon, we will know the Eleventh Circuit's position regarding subsection (b)(6)'s validity.

## III. The Government's Position Regarding Subsection (b)(6) Is Consistent With Its Previous Position Regarding *Bryant*

Defendant's argument that the position the government took prior to *Bryant*—which the Eleventh Circuit ultimately validated—contradicts its position with respect to subsection (b)(6), is illogical. *Bryant*'s holding that the Commission's then-current policy statement controlled all motions brought under § 3582(c)(1)(A)(i), and the government's position regarding subsection (b)(6) is entirely consistent. The government's argument was that the "other reasons" provision valid at that time was for the Commission and ultimately the Bureau of Prisons, not the courts, to decide what those reasons should be. This still holds true.

However, the government's position was not then, and is not now, that the Commission has the authority to promulgate *any* provisions regarding "extraordinary and compelling" reasons that the courts must blindly follow. On the contrary, the Sentencing Commission cannot promulgate guidelines that invalidate laws enacted by Congress. When Congress authorized the Commission to describe what qualifies as an extraordinary and compelling for compassionate release, it did not grant unbounded discretion. *Cf. Batterton v. Francis*, 432 U.S. 416, 428, 97 S.Ct. 2399, 53 L. Ed. 2d 448 (1977) (emphasizing that the delegation of authority to an agency "is

not unlimited"). As "[b]road as [the Commission's] discretion may be, [it nonetheless] must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 753, 117 S.Ct. 1673, 137 L. Ed. 2d 1001 (1997); *cf. Mistretta v. United States*, 488 U.S. 361, 379, 109 S.Ct. 647, 102 L. Ed. 2d 714 (1989) (reasoning that the discretion vested in the Commission does not violate the nondelegation doctrine because the Sentencing Reform Act "sets forth more than merely an 'intelligible principle' or minimal standards" to guide that discretion). Indeed, in the Sentencing Reform Act, Congress directed the Commission to ensure that all guidelines and policy statements remain "consistent with all pertinent provisions of any Federal statute." 28 U.S.C. § 994(a).

Certainly, at the time it made its arguments respecting the Commission's authority in defining "other reasons," the government could not have anticipated that the Commission would—as (b)(6) mandates—preclude a defendant from arguing a non-retroactive *guideline* as support for a sentencing reduction while simultaneously allowing a defendant to argue a non-retroactive *statute* as support for a sentencing reduction under that same subsection.

> At no point did Congress delegate the authority to the Commission to allow non-retroactive changes in law as an extraordinary and compelling ground for compassionate release. It is Congress—and Congress alone—that must make such a determination. That is because Congress is the exclusive entity with the democratic legitimacy and constitutional authority to revise statutes in light of new social preferences and developments. . . . [A]bsent express legislative directive, "the Commission does not have the authority to amend the statute" or "to override the statute as [the court of appeals] has construed it." *Neal v. United States*, 516 U.S. 284, 294, 116 S.Ct. 763, 133 L. Ed. 2d 709 (1996).

*United States v. Gipson*, 2024 U.S. Dist. LEXIS 41968, *11 (N.D.Tx. March 8, 2024).

And Defendant's citation to the government's position before the Supreme Court in *Thacker* does not contradict its subsection (b)(6) argument either. In fact, the portion of the United States' brief that Defendant did not cite is entirely consistent with its position regarding subsection (b)(6): "[T]he First Step Act's amendment to Section 924(c) cannot serve as an 'extraordinary and

compelling' reason for a Section 3582(c)(1)(A) reduction to a preexisting sentence, either by itself or as an addition to other proffered factors." Br. for the United States in Opp'n at 2, *Thacker v. United States* (No. 21-877). Defendant argued that the United States' next sentence in its brief, that "the Sentencing Commission could promulgate a new policy statement that deprives a decision by this Court of any practical significance," somehow demonstrates that the government would support *any* promulgation from the Sentencing Commission—even an illegal one. (DE 377:11). As demonstrated above, that is not the case, and the government's position taken prior to *Bryant* in no way contradicts its argument here.

**IV. Congress' Silence On the § 1B1.13 Amendments Is Not Tantamount to Its Tacit Approval**

Defendant's argument that congressional inaction with respect to the § 1B1.13 amendments signals their approval of same is misguided. *See, e.g. Brecht v. Abrahamson*, 507 U.S. 619, 632 (1993) (noting that "[a]s a general matter, 'we are reluctant to draw inferences from Congress's failure to act'") (quoting *Schneidewind v. ANR Pipeline, Co.*, 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L. Ed. 2d 316 (1988); *Zuber v. Allen*, 396 U.S. 168, 185 n. 21, 90 S.Ct. 314, 24 L. Ed. 2d 345 (1969) ("congressional inaction frequently betokens unawareness, preoccupation, or paralysis").

> Although the Supreme Court recognized that congressional inaction can, in limited circumstances, support an inference that Congress has acquiesced to an agency or judicial interpretation, it has explained that "[l]egislative silence is a poor beacon to follow" in construing a statute. *Allen*, 396 U.S. at 185. And it has repeatedly warned that congressional silence alone is ordinarily not enough to infer acquiescence. *See Solid Waste Agency of N. Cook Cty v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169, 121 S.Ct. 675, 148 L. Ed. 2d 576 (2001) ("Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care."); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137, 106 S.Ct. 455, 88 L. Ed. 2d 419 (1985) ("[W]e are chary of attributing significance to Congress' failure to act . . . ."); *Bob Jones Univ. v. United States*, 461 U.S. 574, 600, 103 S.Ct. 2017, 76 L. Ed. 2d 157 (1983) ("Nonaction by Congress is not often a useful guide . . . .").

*Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1196 (11th Cir. 2019).

> Given the 'presumption against retroactive legislation' that is 'deeply rooted in our jurisprudence' and 'embodies a legal doctrine centuries older than our Republic,' the Court elects not to assign weight to Congress's silence in response to the new policy statement [in § 1B1.13]. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L. Ed. 2d 229 (1994). Doing so would "usurp the legislative prerogative by using 18 U.S.C. § 3582(c)(1) to create retroactivity that Congress did not." *McMaryion*, 2023 U.S. App. LEXIS 15712, 2023 WL 4118015, at *2. Rather, '[i]t is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L. Ed. 37 (1820).

*Gipson*, 2024 U.S. Dist. LEXIS at *14. Thus, the Court should not construe Congress' silence on the § 1B1.13 amendments as its approval of same as Defendant sugests.[5]

---

[5] The government adopts its arguments made in previous filings before this Court and others in the district countering Defendant's remaining arguments defending the validity of subsection (b)(6). Particularly applicable here is the government's argument that as a matter of plain language, a non-retroactive change to a statutory provision is neither "extraordinary" nor "compelling." The word "extraordinary" should be understood "to mean 'most unusual,' 'far from common,' and 'having little or no precedent,'" *United States v. McCall*, 56 F.4th 1048, 1055 (6th Cir. 2022) (en banc).

Far from being unusual, uncommon, or unprecedented, a defendant's lawfully imposed sentence simply reflects the law at the time he was sentenced and the law that remains in place today. Similarly, the word "[c]ompelling" should be understood to provide a "forcing, impelling, [or] driving" reason to disturb the finality of a federal sentence. *McCall*, 56 F.4th at 1055. To treat a nonretroactive change in the law as a "compelling" reason to disturb a final sentence would thus undo the balance already struck by ordinary nonretroactivity principles. *See Dorsey v. United States*, 567 U.S. 260, 280 (2012) (noting that "the ordinary practice is to apply new penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced."); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (finding that this practice suggests a "presumption against retroactive legislation" that is "deeply rooted in our jurisprudence" and that "embodies a legal doctrine centuries older than our Republic.").

In other words, there is nothing extraordinary and compelling about the fact that the defendant's sentence reflects the statutory penalty that existed at the time he was sentenced and that still exists today. That sentence "was not only permissible but statutorily required at the time." *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, C.J., concurring) ("Indeed, the imposition of a sentence that was not only permissible but statutorily required at the time is neither an extraordinary nor a compelling reason to now reduce that same sentence."); *United States v. Jarvis*, 999 F.3d 442, 444 (6th Cir. 2021) (explaining that a prospective change to sentencing law

**V. Defendant's Dangerousness is a "Disqualifying Characteristic" Under § 1B1.13(a)(2)**

"A district court considering a motion for compassionate release must ordinarily consider the § 3553(a) factors in deciding whether to exercise its discretion. . . . But dangerousness is a 'disqualifying characteristic' under the policy statement in § 1B1.13[(a)](2), and where it exists the § 3553 factors do not come into play." *United States v. Noesi*, USCA 11, Case No. 20-12827, at 7, n. 2 (11th Cir. 2021) (internal citation omitted) (unpublished). As detailed above, Defendant was a member of a violent street gang the Terrorist Boyz (PSI ¶ 14). Not only was he involved with selling narcotics, but he routinely carried a firearm during his drug deals for protection. *Id.* He and his gang members were responsible for burglarizing at least one gun shop, wherein he participated in the theft of over 33 firearms (PSI ¶ ¶ 14-15). Several of the stolen firearms were assault weapons, and during the undercover operation which led to Defendant's arrest, he participated in a scheme to turn some of them into fully automatic weapons. *Id.* at 10-11. Defendant also participated in trafficking many of the stolen firearms to known drug traffickers. *Id.* at 4-7.

Although Defendant claims he has "no history of violence," his membership in a violent gang, participation in the burglary of a gun store, selling of firearms to known narcotics traffickers, his agreement to make those weapons into fully automatic guns, and carrying his own firearm for protection during his drug dealing strongly contradicts his claim. To suggest that because there is no proof Defendant ever discharged his weapon during any of his drug deals or otherwise, that he does not qualify as dangerous misses the point. Putting stolen firearms in the hands of other violent criminals—who would otherwise not legally be able to obtain them—is just as dangerous. In 2021,

---

is a "legally impermissible ground" for finding an "extraordinary and compelling reason," even when it is "combined with" other considerations).

48,830 Americans died by firearms—an average of one death every 11 minutes. Johns Hopkins, Bloomberg School of Public Health, Center for Gun Violence Solutions, *Firearm Violence in the United States*, https://publichealth.jhu.edu/center-for-gun-violence-solutions/research-reports/firearm-violence-in-the-united-states. Over 20,958 Americans died by firearm homicide. *Id.* Additionally, an average of more than 200 Americans visit the emergency department for nonfatal firearm injuries each day. *Id.* The firearm homicide rate in the United States is nearly 25 times higher than other high-income countries. *Id.* Over 40% of all firearm deaths are homicides. *Id.* Firearms drive our nation's high homicide rate, accounting for 8 out of every 10 homicides committed. *Id.*

Last Friday, May 31st, the United States Attorney for the Southern District of Florida emphasized the danger of firearms trafficking and the impact on our community:

> All too often these powerful firearms then make their way into the hands of felons, gang members, and other violent offenders. Some of these weapons make their way into countries in our hemisphere, with undesirable consequences in those places as well. Our Office will continue to work with our law enforcement partners to identify targets who unlawfully traffic in and possess firearms, prosecute the offenders, and reduce gun violence. We are grateful for the men and women in law enforcement who put their lives on the line to help keep our communities safe and firearms out of the hands of unauthorized persons.
>
> "Firearms trafficking is a crime that affects our communities in many ways and ATF and HSI Miami are in communication and collaboration with our unique jurisdictions to combat the flow of illegal weapons to those who perpetrate violent acts in a myriad of fashions to the detriment of public safety domestically and internationally," said ATF Miami Special Agent in Charge Christopher A. Robinson.
>
> "The illegal trafficking of weapons out of the United States is a top priority for HSI. These weapons are fueling the violence in our neighboring nations and continues to destabilize parts of the region," said Anthony Salisbury, Special Agent in Charge of HSI Miami. "HSI will continue to collaborate with our domestic and international law enforcement partners to target individuals and criminal organizations that are involved in the illicit movement of firearms."

The United States Department of Justice, United States Attorney's Office Southern District of Florida, Friday, May 31, 2024, Press Release, *Thirteen defendants charged with firearms trafficking and related offenses; over one hundred-forty firearms seized*, www.justice.gov/usao-sdfl.

Defendant's characterization of his crimes as nonviolent severely downplays the nature of his offenses.[6] Based on Defendant's offense characteristics, he is a danger to the community, and therefore ineligible for compassionate release.

## VI. Defendant Is Not in the Same Category as Mr. Rodriguez, as Defendant's Section 3553(a) Factors Preclude Relief

Alternatively, should the Court find Defendant is not dangerous pursuant to § 1B1.13(a)(2) thereby precluding compassionate release, Defendant's § 3553(a) factors warrant the denial of his motion. Defendant's citation to the government's concession in Mr. Rodriguez' case as support for his motion is unavailing. For starters, Mr. Rodriguez had no criminal history, and his more violent co-defendant received a much lesser sentence on a resentencing, creating a disparity. And most importantly, Mr. Rodriguez had an outstanding rehabilitation history. *See* Exhibit B at 7-10. In fact, Judge Middlebrooks pointedly remarked that it was solely Mr. Rodriguez' "individual achievements" that compelled him to grant compassionate release. *Id.* at 8. Judge Middlebrooks agreed with Mr. Rodriguez' counsel that he had gone through an "extraordinary transformation from a troubled teen into a devoted son, student, and community man." *Id.* Judge Middlebrooks highlighted Mr. Rodriguez' "unique record of rehabilitation" as follows:

> Mr. Rodriguez's file is replete with testimonials and anecdotes that demonstrate that throughout his incarceration he has endeavored to further improve himself, support others, and reckon with his mistakes. **Most recently, Mr. Rodriguez saved a prison staff member from severe bodily injury when during his**

---

[6] Notably, defendants convicted of § 924(c) offenses are ineligible under the First Step Act for time credits under the Act. *See* 18 U.S.C. § 3632(d)(4)(D)(xxii).

> **UNICOR Federal Prison Industries shift, Mr. Rodriguez put himself in harm's way to prevent machinery from crushing the staff member's leg.** Prior to this one incident, Mr. Rodriguez committed himself to his own education, earning his GED, taking several certification courses, and obtaining his forklift license. **Mr. Rodriguez was selected from over 1,200 inmates for a presentation on the benefits of the Non-Residential Drug Abuse Program to Attorney General William Barr, Senators Lindsey Graham, Tim Schott, and other U.S. Officials**. Mr. Rodriguez has also dedicated **more than 200 hours** mentoring young people as part of the youth Encouragement Program.
>
> **Most illustrative of Mr. Rodriguez's character are the letters of support that Mr. Rodriguez has submitted.** Senior Officer R. Crews wrote, "in **my 30+ years** of law enforcement experience **I have never written a letter of recommendation** for anyone that I've arrested or supervised during their incarceration." Yet for Mr. Rodriguez, Officer Crews wrote that he was a "model inmate" and a "good individual to consider for any positive consideration in sentence reduction." Correctional Officer Specialist B. Thomas wrote that Mr. Rodriguez "is and always has been a man that works hard and efficiently, a man that is courteous and kind, an outstanding mentor to fellow inmates as well as staff, and a true example of what a human being should be, not just an inmate." Safety Specialist R.H. Garcia writes of Mr. Rodriguez, "he is highly motivated, extremely astute, and dedicated to bettering himself and those around him."

*Id.* at 8-9 (emphasis added).

Judge Middlebrooks continued to commend Mr. Rodriguez for the "strength of [his] character" and the employment he had already been offered once released at Pumps One Unlimited as a sewer and storm manhole repair technician—a job he acquired based on his hard work while incarcerated. *Id.* at 9. Mr. Rodriguez' family also sent glowing letters about him and offered their unconditional support. *Id.*

Defendant's record stands in stark contrast to Mr. Rodriguez'. Defendant has no letters of recommendation or commendation from prison authorities; he has not committed a fraction of the time to improving himself and no time helping others as Mr. Rodriguez has; he has no employment prospects; and his family has not shown the level of support—or any, other than his father's confirmation that he can live with him and use his car for job interviews—for Defendant if he were to be released. And even if Defendant manages to obtain such letters in his reply, they will not

overshadow his crimes of conviction and the lengthy disciplinary infractions he has incurred during his incarceration.

Indeed, his pre and post sentencing conduct demonstrate that his Section 3553(a) factors preclude compassionate release. As already discussed, his membership in a violent street gang that burglarized gun stores and then trafficked those firearms to known drug dealers, while keeping some of the assault weapons for himself for protection during his drug deals evidences he is a danger to the community. These considerations of violence and firearms alone independently preclude relief. *See United States v. Marrero*, 11-CR-568, 2020 WL 7079483 at *5 (S.D.N.Y. Dec. 3, 2020) (noting that firearm offenders continued to recidivate later in life than non-firearms offenders and recidivated at nearly twice the rate of non-firearms offenders among those released after age 50); *United States v. Solomon*, CR 05-350, 2022 WL 357229 at *3 (W.D. Pa. Feb. 7, 2022) ("although statistics show that criminal defendants are less likely to recidivate as they grow older and move into retirement age, not all defendants cease engaging in criminal behavior when they grow old.").

Moreover, Defendant's post-sentencing conduct demonstrates a continuous pattern of violence and failing to abide the law. He has been sanctioned repeatedly during his incarceration—twenty-seven (27) times to be exact—and several of his infractions were for possessing a dangerous weapon and fighting with other inmates; on one occasion his violence resulted in serious injury to the other inmate. *See* Exhibit "D" at 6-7 (Disciplinary History).

And while Defendant touted his drug rehabilitation in his motion, he had an alarming amount of drug possession and use infractions—the most recent of which occurring in 2019, which was *after* his completion of the drug rehabilitation program in 2018 that he cites to in his motion.

*Id.* at 2-6. Defendant also frequently refused his work assignments, most recently in 2021 on two separate occasions occurring within a month's time. *Id.* at 1.

While Defendant claims it was his youth and "immature prefrontal cortex" that lead to his lack in judgment in committing his serious firearm and drug offenses, as his disciplinary record confirms, his judgement did not improve in his thirties and forties. Defendant's obstructive behavior has continued for over twenty (20) years post-sentencing, and his demonstrated violence, drug use and refusal to follow the law evinces a high risk of him posing a continued threat to the public.

Accordingly, the 3553(a) factors overwhelmingly weigh against his early release from custody.

**CONCLUSION**

For the foregoing reasons, the Defendant Richard Daniel's Motion should be denied.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: *<u>/s/ Alicia E. Shick</u>*____________________
Alicia E. Shick
Assistant United States Attorney
Florida Bar No. 124842
500 E. Broward Boulevard, Suite 700
Fort Lauderdale, Florida 33394
Telephone: 954-660-5793
Email: alicia.shick@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 3, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Alicia E. Shick*__________
Alicia E. Shick
Assistant United States Attorney